**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DOWNINGTOWN AREA SCHOOL DISTRICT**<br><br>   **v.**<br><br>**G.W., et al.** | **CIVIL ACTION**<br><br>**NO. 19-5424** |

Baylson, J.                                                             October 8, 2020

<u>**MEMORANDUM RE: CROSS-MOTIONS FOR JUDGMENT ON THE**</u>
<u>**ADMINISTRATIVE RECORD**</u>

**I.      <u>Introduction</u>**

In this case, the Court is called to decide whether (1) to affirm or reverse, in whole or in part, the ruling of the Hearing Officer who concluded that Plaintiff Downingtown Area School District failed in part to provide a free, appropriate education in its obligations to one of its students, G.W., and (2) to award G.W.'s parents certain costs and fees of the proceeding.

For the reasons that follow, the Court will AFFIRM the Hearing Officer's Ruling, AWARD G.W.'s parents 50% of their reasonable costs and fees incurred in the proceeding below, and AWARD G.W.'s parents all of their reasonable costs and fees incurred.

**II.     <u>Procedural History</u>**

On October 31, 2018, the Parents filed a Due Process Complaint against the District under the IDEA and Section 504 of the Rehabilitation Act of 1973 alleging that the District had failed to provide G.W. a free, appropriate public education ("FAPE") since October 31, 2016.  The parties held a three-day hearing on the Due Process Complaint before a Pennsylvania Special Education Hearing Officer on January 16, 2019; March 14, 2019; and June 26, 2019.

On August 22, 2019, the Hearing Officer ruled ("the Ruling") in part for the Parents and in part for the District. The Hearing Officer concluded that the District had offered G.W. a FAPE from October 31, 2016 to February 8, 2017 and during the 2017–2018 school year, as well as over the summers. However, the Hearing Officer concluded that G.W. had not made appropriate progress from February 9, 2017 to the end of the 2017 school year or during the 2018–2019 school year and had therefore been denied a FAPE during those periods. In determining that G.W. had been denied a FAPE during those periods, the Hearing Officer relied primarily on the goals and commitments memorialized within the IEPs[1] themselves. The Hearing Officer awarded G.W. compensatory education for each period.

On November 19, 2019, the District filed a civil complaint to appeal the Ruling. ECF 1. That complaint was assigned to the undersigned. One day later, G.W. and his Parents ("the Family") filed a separate civil complaint to recover their fees and costs. ECF 7. That civil complaint was assigned to Judge Kenney. Id. On February 13, 2020, the parties jointly moved to consolidate the two cases. Id. That same day, the two cases were consolidated before the undersigned. ECF 8.

On March 13, 2020, the administrative record was filed under seal. ECF 11, 12. On April 15, 2020, the District filed its Motion for Judgment on the Administrative Record. ECF 13. On May 14, the Family filed its response and cross-Motion for Judgment on the Administrative Record. ECF 14. The District replied on May 29, ECF 15, and the Family replied on June 15, ECF 16.

---

[1] An Individualized Education Program ("IEP") refers both to a customized educational plan for a student with a disability and a document that contains the plan itself.

### III.   <u>Factual History</u>

With rare exceptions, the Hearing Officer's findings of fact are undisputed. The parties do sometimes dispute what to make of factual ambiguities or attempt to draw more attention to facts on which the Hearing Officer's Ruling did not focus.  It is rare that such disputes indicate actual disputes of fact rather than mere disagreements over emphasis.  The following review of the facts of the case will clearly identify actual factual disputes among the parties.

The facts below are drawn from the Hearing Officer's Ruling except as noted.

a.   <u>Up to 2016</u>

G.W. is a child with disabilities under the IDEA.  G.W. qualifies for special education as a child with Autism and a secondary classification of Speech and Language Impairment.  The parties agree that G.W.'s "needs are many, complex, and interconnected."  Ruling at 12.  The District first evaluated him May 2008 before he began attending kindergarten in the District in the 2008-2009 school year.  <u>Id.</u> at 2–3.  The District has regularly reevaluated G.W. since G.W. first enrolled with the District; for example, the District evaluated G.W. at the end of his second grade year, at the start of his fifth grade year, and early in his sixth grade year.  <u>Id.</u> at 3–4.

In October 2015, the October of G.W.'s seventh grade year, the District conducted a Functional Behavior Assessment.  <u>Id.</u> at 4.  Following that assessment, the District adopted an IEP on February 5, 2016, subsequentially revised on March 3, 2016 ("March 2016 IEP").  <u>Id.</u>  The March 2016 IEP contained fifteen goals.[2]  Ruling at P-5.

---

[2] There is some confusion among the briefs and even within the briefs about whether the March 2016 IEP had fourteen or fifteen goals.  This Court counts fifteen.  Whether the correct number is fourteen or fifteen is immaterial to this case.

b. <u>2016–2017: Eighth Grade</u>

During eighth grade, G.W. received math, English language arts, and science instruction, as well as language and academic skills, in an autistic support classroom for about seventy percent of his time. <u>Id.</u> at 4.  He participated in the regular education environment for specials, lunch, and assemblies, which accounted for the remaining thirty percent or so of his time at school. <u>Id.</u>

He remained under the March 2016 IEP until a new IEP took effect on February 9, 2017 ("February 2017 IEP"). <u>Id.</u>  The February 2017 IEP included eleven goals. <u>Id.</u> at P-10.  Relative to the March 2016 IEP, the new IEP created some new goals, updated others, and repeated five goals verbatim. <u>Id.</u> at 4; <u>id.</u> at P-5; <u>id.</u> at P-10.

On February 14, 2017, the Parents informally asked the District to reevaluate G.W. <u>Id.</u> They provided formal consent to a reevaluation on March 7, 2017. <u>Id.</u>  Following their request, the District reevaluated G.W. and completed a report on the reevaluation on May 6, 2017. <u>Id.</u> G.W.'s IEP team met in May and June 2017 to discuss his reevaluation and create an IEP for the next school year ("June 2017 IEP"). <u>Id.</u> at 6.  The team agreed that G.W. would benefit from a mixture of community-based and individualized instruction. <u>Id.</u>

The goals included in the June 2017 IEP, however, were "substantively similar if not identical [to] those of the February 2017 IEP, which was mostly carried over from the March 2016 revised IEP, which was substantively identical to the February 5, 2016 IEP." <u>Id.</u>  Several of the June 2017 IEP goals were "copied verbatim" from the February 2017 IEP." <u>Id.</u>

c. <u>2017–2018: Ninth Grade</u>

For the 2017–2018 school year, G.W attended one of the District's high schools, participating in a mixture of autistic support classrooms (reading, writing), instruction with evolving group sizes in learning support classrooms (math), and community-based instruction

(functional academics).  Id. at 6–7.  G.W. would also work on functional academic development by performing mail delivery and "snack cart prep" activities for the school.  Id. at 7.  G.W.'s IEP updated his IEP on September 25, 2017.  Id.

In February and March 2018, G.W.'s parents requested and received a private neuropsychological evaluation for G.W.  Id.  The private evaluator completed a report on the assessment ("Private Evaluation"), concluding, among other things, that G.W. is a child with Autism and a Language Disorder."  Id.  The Private Evaluation also included fifteen recommendations for G.W.'s education, including the use of one-on-one or small-group instruction for reading/literacy, mathematics, and written language classes.  Id. at 7–8.  It also recommended inclusion settings (with a support teacher) for science, history, social studies, and some other classes.  Id. at 8.  Its other recommendations included applying assertive technology evaluations and creating an individualized transition plan with a focus on vocational and independent-living skills.  Id.

The Parents provided the Private Evaluation to the District in March or June 2018.  Id. at 7.  On July 11, 2018, the IEP team reconvened, this time with the private evaluator, to review it. Id. at 8.  Discussing plans for the 2018–2019 school year, the team agreed to conduct a transition assessment using the Practical Assessment Exploration System ("PAES"), begin using work experience and a planner-based organization system to help G.W. develop functional skills, and implement the SETT framework for G.W.'s assistive technology needs.  Id. The SETT framework is an ongoing process by which a student uses assistive technology and the evaluator continually adapts the technology to respond to the student's needs.  Id.

d.  2018–2019: Tenth Grade

During the 2018–2019 school year, G.W. generally participated in the same academic class environments as the prior year.  Id.  His reading classes, however, included an additional mixed-class-size program called Read 180, which took the time slot of the previous year's prevocational and community-based functional instruction.  Id. at 9.  His functional academics program added a supported work program at a local convenience store.  Id. at 8–9.  The school also began using the SETT framework for assistive technology at the beginning of the school year.  Id. at 8.  It would not begin using the PAES assessment until December 2018 (after the Parents had requested the due process hearing).  Id. at 9.

The IEP team reconvened October 2 and 5, 2018.  Id.  As a result, the District issued a revised IEP ("October 2018 IEP") to update the student's Present Education Levels and replace direct occupational therapy services with consultative occupational therapy.  Id.  The October 2018 IEP otherwise did not alter the District's services.  Id.  When issuing the October 2018 IEP, the District also issued a Notice of Recommended Educational Placement ("NOREP"), which the Parents cited to reject the October 2018 IEP.  Id.

On October 29, 2018, the IEP team met again, this time proposing revisions to the student's Present Education Levels, assessment plan, and SDI.  Id.  The amended IEP ("Amended 2018 IEP") specifically changed the SDI by adding letter grades for academic environments, clarifying that teachers could require unmodified assignments from G.W. but would grade on a modified scale, promote teacher check-ins and assistance in breaking down larger assignments, including testing accommodations, and reminding G.W. to use various self-help tools.  Id.

The Parents then requested a due process hearing on October 31, 2018, id., after which the District discontinued the SETT framework.  Id.  The PAES assessment began in December 2018,

but the District informed the Parents in March 2019 that it was being improperly administered, and, as such, the results were invalid and unusable.  Id. The District did not conclude either the SETT framework or the corrected PAES assessment before the Hearing Officers issued his Ruling. Id. at 16.

## IV.   **Legal Standards**

### a.   IDEA Framework

"The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children or pay for their education elsewhere if they require specialized services that the public institution cannot provide." D.K., 696 F.3d at 244 (quoting P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009)). "Accordingly, schools must: (1) identify children in need of special education services (Child Find); and (2) provide a FAPE to disabled students."  Id.

IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 1001 (2017).  In other words, the educational program "must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities."  K.D. by and through Dunn v. Downingtown Area Sch. Dist., 904 F.3d 248, 254 (3d Cir. 2018) (quoting Ridley Sch. Dist. v. M.R., 680 F.3d 260, 269 (3d Cir. 2012)).  An educational program should be "likely to produce progress, not regression or trivial educational advancement."  Id. at 254 (quoting Ridley, 680 F.3d at 269).

Parents are entitled to certain remedies when school districts fall short of their obligations. One such remedy is compensatory education, or the "replacement of educational services the child

should have received in the first place." <u>Ferren C. v. Sch. Dist. of Phila.</u>, 595 F. Supp. 2d 566, 577 (E.D. Pa. 2009) (Dalzell, J.) (quoting <u>Reid v. Dist. of Columbia</u>, 401 F.3d 516, 518 (D.C. Cir. 2005)); <u>see also</u> <u>Lester H. v. Gilhool</u>, 916 F.2d 865, 872–73 (3d Cir. 1990). There is no requirement that "the district's behavior . . . rise to the level of slothfulness or bad faith" for compensatory education to be an appropriate remedy. <u>M.C. v. Cent. Reg'l Sch. Dist.</u>, 81 F.3d 389, 397 (3d Cir. 1996). Where compensatory education is warranted, the student "is entitled to [it] for a period equal to the period of deprivation, excluding the time reasonably required for the school district to rectify the problem." <u>Id.</u>

   b.  <u>Section 504 Framework</u>

Section 504 of the Rehabilitation Act prevents public schools receiving federal funds from discriminating against individuals with disabilities. <u>See</u> <u>Ridley Sch. Dist. v. M.R.</u>, 680 F.3d 260, 280 (3d Cir. 2012). Section "504's 'negative prohibition' is similar to the IDEA's 'affirmative duty' and also requires schools that receive federal financial assistance to 'provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.'" <u>Id.</u> (quoting <u>W.B. v. Matula</u>, 67 F.3d 484, 492–93 (3d Cir. 2012)); <u>see also</u> 34 C.F.R. § 104.33(a).

An "appropriate" education constitutes "regular *or* special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of [§§] 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b) (emphasis added).

The Third Circuit has elaborated on this requirement: "To offer an 'appropriate' education under the Rehabilitation Act, a school district must *reasonably* accommodate the needs of the

8

handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." Ridley, 680 F.3d at 280 (emphasis added). "However, § 504 does not mandate 'substantial' changes to the school's programs." Id. (quoting Se. Cmty. Coll. v. Davis, 442 U.S. 397, 405 (1979)).

c.   Standard of Review

"The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." Ridley, 680 F.3d at 270. Also, this Court must afford the Hearing Officer's decision "due weight." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester, Cnty v. Rowley, 458 U.S. 176, 206 (1982). In this Circuit, "due weight" means a "modified de novo" review in which "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and this Court must explain any rejection of them. Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (quoting S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003)). In addition, this Court must accept the Hearing Officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995). However, this Court reviews the Hearing Officer's legal conclusions de novo. S.H., 336 F.3d at 270.

This Court must be cautious in two respects.

First, it must center every step of its analysis on the facts known at that time rather than what is known now. Although it may consider later-acquired evidence, such evidence "should be used . . . only in assessing the reasonableness of the district's initial decisions regarding a particular IEP or the provision of special education services at all." Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3d Cir. 1995). In other words, "[n]either the statute nor reason countenance

'Monday Morning Quarterbacking.'" Id. (quoting Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993)).

Second, this Court must not overstep.  The Supreme Court has cautioned that IDEA's judicial review provision is not an "invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Rowley, 458 U.S. at 206.

## V.    Discussion

### a.   Denial of FAPE and the Hearing Officer's Award of Compensatory Education

The District appeals the substance of the Ruling.  The Family does not.  Given that fact, only the two time periods in which the Hearing Officer concluded the District denied G.W. a FAPE are at issue here.  This Court will address each of them in turn.

#### i.   Seventh Grade: February 9, 2017 to the End of the 2016–2017 School Year

The central issue for this period is whether G.W. made "progress appropriate in light of [his] circumstances," Endrew F., 137 S. Ct. at 1001.  There is no dispute that G.W. made some progress.  IDEA, however, requires more than "some" progress.  The Family contended, and the Hearing Officer agreed, that G.W. could have made more progress.  The District responds that G.W.'s progress is evidence that it provided G.W. a FAPE.

A key threshold question is how much G.W. should have progressed.  As the Hearing Officer observed, there is an "absence of objective evidence establishing a reasonably expected [progression] rate" in this case.  Ruling at 12.  Given that absence, the Hearing Officer looked to the goals stated in G.W.'s March 2016 IEP for evidence of how much G.W. could be expected to progress.  Given that the sole issue in this case is the adequacy of G.W.'s progress, that was a sensible choice.  The March 2016 IEP was a forward-looking document which all parties helped create, which makes it a relatively objective source.  The IEP goals are also concrete and

measurable, at least compared to the many abstract measures of a student's potential that evaluation processes rely on and produce.  Of course, an IEP will not always be the best evidence of how quickly a student should progress.  If a district fails in its procedural obligations, for example, there may simply be no IEP to rely on.  Here, the Court concludes that the Hearing Officer's choice was appropriate.

The Hearing Officer concluded that the District denied G.W. a FAPE for this period based on a combination of four facts.  First, for the reasons explained above, he assumed that the March 2016 IEP goals were appropriate.  Second, he found that the goals in the February 2017 IEP "were, in significant part, repeated verbatim from the . . . [March] 2016 IEP because [G.W.] had not mastered these goals."  Id. at 13.  Third, he found that the Specially Designed Instruction ("SDI") and related services the District offered G.W. did not "substantively change" from February 2017 through the end of the school year.  Id.  And, fourth, he found that the District did not propose to reevaluate G.W. in advance of formulating the February 2017 IEP despite being aware in advance that G.W. was not meeting all his goals.  Id.

The Hearing Officer concluded that these facts together showed that G.W.'s educational progress was stagnating, and the District's approach was also stagnating.  Id.  He wrote, "[i]f a goal is appropriate, and a child does not master the goal, the IEP team must determine how the IEP should change to enable the child to reach the goal."  Id.  "Conversely, if the District provided appropriate special education under the [March] 2016 IEP, that would signal a problem with the goals."  Id.  Because G.W. had not met many of the goals in his March 2016 IEP, and it did not appear that the District had made appreciable efforts to change the IEP to fix either the goals or the educational programming, the Hearing Officer held that the District had substantively denied G.W. a FAPE for this period.

The District contests the second, third, and fourth factual findings listed above. This Court will discuss each in turn.

First, the District takes issue with Hearing Officer's finding that the "2017 IEP's goals were, in significant part, repeated verbatim from the . . . 2016 IEP."[3] The Hearing Officer relied on this finding in concluding that G.W. had not made appropriate progress under the March 2016 IEP. The Court has closely reviewed the 2016 and 2017 IEPs. The March 2016 IEP contained fifteen goals, and the February 2017 IEP contained eleven. It appears that five goals were identical, aside from slight differences in phrasing. Five is a "significant part" of fifteen. It is a more "significant part" of eleven. There is no reason to disturb the Hearing Officer's finding that the "2017 IEP's goals were, in significant part, repeated verbatim from the . . . 2016 IEP."

Second, the District contends that "there is no evidence" to support the Hearing Officer's finding that "instruction or programming did not change with the February 2017 IEP." Dist. Br. at 13. However, the Hearing Officer did not make the finding the District disputes. He found that the SDI and related services "that the District provided to [G.W.] did not *substantively* change for the remainder of the 2016–2017 school year." Ruling at 13 (emphasis added). This Court assumes that the District meant to attack the finding the Hearing Officer actually made and will proceed accordingly.

In attacking the Hearing Officer's finding, the District emphasizes two contrary facts: (1) that the Parents "did not testify nor did they present any witnesses to support the Hearing Officer's uncorroborated theory [(i.e., the finding)];" and (2) that "not all of G.W.'s IEP goals were

---

[3] As the District puts it more specifically, the Hearing Officer found that "both IEPs in comparison included 14 'verbatim' goals." Dist. Br. at 8. As far as this Court can tell, the Hearing Officer made no such finding.

continued from the [March] 2016 IEP to the February 2017 IEP." Dist. Br. at 13. Neither objection is persuasive.

The March 2016 and February 2017 IEPs themselves provided ample documentary evidence for the Hearing Officer's finding. Each IEP provides a list of educational methods the District will use with G.W.: SDI strategies, Related Services to be offered to G.W., and supports for school personnel involved in implementing the IEP. This Court has closely reviewed and compared those lists. There are only a few modest differences between the March 2016 and February 2017 IEPs' lists. Certainly, there was no need for the Parents to testify or call witnesses when such evidence was available in the documentary record.

That some goals changed from the March 2016 IEP to the February 2017 IEP does not undermine the Hearing Officer's conclusion that the District offered G.W. substantially the same educational programming under each IEP. Granted, the District's goals for G.W.'s education might provide some evidence of the District's intended educational methods. However, the Hearing Officer was entitled to conclude that the IEPs' lists of educational methods were better evidence of the District's educational methods than the IEPs' lists of goals. There are no grounds to overturn the Hearing Officer's finding that the District did not substantively change its educational methods between the March 2016 and February 2017 IEPs.

Third, and last, the District contends that the Hearing Officer "incorrectly found [the District] at fault for not proposing a reevaluation before the Parents issued their request" for a reevaluation. Dist. Br. at 9. "It is as if it is a race and [the District] is being punished for coming in second." Id. Again, the District is attacking a finding that the Hearing Officer did not make. The Hearing Officer found that the District had failed in its obligations because the District failed to reevaluate G.W. *in advance* of the February 2017 IEP meeting. Ruling at 13. The District was

"not surprised by [G.W.]'s progress," and his failures to progress, "[t]hanks to consistent data collection." Id. The Hearing Officer concluded that, given its advance knowledge of G.W.'s failures to progress, the District could have sought a reevaluation in time for the reevaluation to inform the February 2017 IEP. Id. The District has supplied no reason to disbelieve that finding. The Court, therefore, will not overturn it.

The Hearing Officer drew reasonable factual and legal conclusions from the evidence available. The District contends that there could have been several other bases why the IEP goals did not change from one year to the next. But the Court finds that there was enough evidence for the Hearing Officer to fairly conclude that the similarity of the IEPs indicated a failure from the District — many goals were continuing even though the placement was not changing, the type of instruction occurring was not being modified, the program was not being altered, and any "pending" evaluation was already untimely.

Ultimately, "it is the responsibility of the child's teachers, therapists, and administrators — and of the multi-disciplinary team that annually evaluates the student's progress — to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly." Cent. Reg'l Sch. Dist., 81 F.3d at 397. The Hearing Officer concluded that the District did not ascertain G.W.'s educational needs, respond to his deficiencies, and place him accordingly from February 9, 2017 to the end of that school year. That conclusion was reasonable. This Court will therefore AFFIRM that portion of the Ruling.

      ii.    Tenth Grade: the 2018–2019 School Year

The Hearing Officer concluded that the District failed to provide G.W. with a FAPE during the 2018–2019 school year. He based this conclusion on the District's failure to promptly and effectively carry out the PAES evaluation and SETT frameworks. At the time he wrote, "the Parents have no resolution about the Student's assistive technology and transition needs." Ruling

14

at 16. This was problematic, because "[b]oath the Private Evaluation itself and the parties['] agreement to conduct those SETT and PAES evaluations indicate an expectation that both would produce information to drive IEP development." Id. The District's decision to pause the SETT framework during the hearing was not an excuse for having failed to complete the SETT framework; the SETT framework was an evaluation, which must continue "absent an explicit revocation of consent." Id. And while the "delay and the errors [in the PAES evaluation] were out [of] District's control, . . . those difficulties cannot diminish [G.W.]'s right to a FAPE." Id.

Ultimately, "[f]or the entirety of the 2018–2019 school year, the District knew that it was missing information from necessary evaluations." Id. Reasoning that "the missing PAES assessment [wa]s directly related to the overarching functions of the Student's education," and "the particular importance of unknown information in this case," but recognizing that the denial of FAPE "occurred [only] in discrete domains related to the evaluations," the Hearing Officer awarded thirty minutes of compensatory education for each hour that G.W. attended school that year. Id.

The District attacks this award on numerous grounds. Before turning to those issues, this Court observes that it was reasonable for the Hearing Officer to focus on whether the District carried out the commitments to evaluate that the District has made and memorialized in the July 18, 2018 IEP. The reasons are essentially the same as the reasons it was reasonable for the Hearing Officer to focus on the March 2016 and February 2017 IEPs' goals in assessing whether the District provided G.W. a FAPE from February 9, 2017 to the end of the 2016–2017 school year. That is, the IEPs are forward-looking, concrete, and measurable documents that reflect the best educational judgment of all the parties involved in providing G.W. educational support.

1.   *Transition Assessments and the PAES Evaluation*

The District has a few objections to the Hearing Officer's factual findings and legal conclusions concerning its administration of transition assessments, particularly the PAES evaluation, to G.W.

First, the District argues that the Hearing Officer erroneously found that "the May 2017 [reevaluation report] did not include a transition assessment," which was "used as a basis to support an award of compensatory education for G.W.'s year."  Dist. Br. at 10, 15.  The District does not explain, and the Court does not find that the Hearing Officer's conclusion with respect to the transition assessment affected the Hearing Officer's ruling with respect to G.W.'s 2018–2019 school year.  Instead, the Hearing Officer concluded that the District denied G.W. FAPE by failing to conduct the PAES evaluation.  Ruling at 16.  As this Court understands it, the District's July 2018 commitment to conduct the PAES evaluation superseded any obligation, fulfilled or not, to conduct a transition assessment as part of the 2017 reevaluation report.  And it was the failure to fulfill that superseding obligation that supported the Hearing Officer's finding the District denied G.W. a FAPE.

Second, the District argues that the Hearing Officer erred in finding that it did not complete the PAES evaluation at all.  Dist. Br. at 10–11, 15.  Once more, the Hearing Officer did not make the complained-of finding.  Instead, the Hearing Officer found that the District did not complete the PAES evaluation soon enough for the PAES evaluation to be useful and that the Parents have no resolution on the PAES evaluation.  Ruling at 16.  This Court agrees.  In July of 2018, the District agreed to conduct the PAES evaluation beginning in September of 2018 so that the PAES evaluation could inform G.W.'s educational programming during the 2018–2019 school year.  However, the District did not even manage to begin the PAES evaluation in September of 2018, let alone complete the PAES evaluation in time for it to inform G.W.'s educational programming.

The District did not start the PAES evaluation until December of 2018.  Then, in part due to problems with how it administered the PAES evaluation the first time around, the District did not complete the PAES evaluation until May of 2019.  It appears that, had the District not made its mistakes, it might have completed the PAES in March of 2019.  March of 2019 would still have been late.  The practical effect of these delays was that G.W. did not have the benefit of the full PAES evaluation for any part of the 2018–2019 school year.  And the Hearing Officer reasonably concluded that the PAES evaluation was important, because it "relates to [G.W.]'s future beyond high school."  Id.  The delays may have been out of the District's control, "but those difficulties cannot diminish [G.W.]'s right to a FAPE."  Id.

The District argues that it still learned about G.W.'s educational needs from the first, invalid, and untimely PAES evaluation.  But the District has not explained at all how an invalid, untimely PAES evaluation is an adequate substitute for the valid, timely PAES evaluation that, again, the District had long since committed to conduct.  This Court sees no reason to overturn the Hearing Officer's conclusion that the PAES arrived too late to be useful.

Third, the District argues that G.W.'s IEPs provided for appropriate supports and services for G.W.'s eventual transition to post-school activities.  Id. at 15–19.  It is possible that the District provided G.W. adequate transition programming in the 2018–2019 school year.  But, as the Hearing Officer rightly observed, "[s]atisfaction of th[e student's] right [to a FAPE] requires an IEP based on data obtained through evaluations and progress monitoring."  Ruling at 16.  As the Hearing Officer found, id., the PAES evaluation should have provided the data against which the appropriateness of a transition plan could be measured.  Having failed to complete the PAES evaluation that was supposed to be used to assess the adequacy of G.W.'s transition programming in the 2018–2019 school year, the District cannot argue that it provided G.W. adequate transition

17

programming in the 2018–2019 school year.  Having deprived itself, the Family, the Hearing

Officer, and this Court of this promised yardstick, the District cannot maintain that it measured up.

       2.   *The SETT Framework*

The District criticizes the Hearing Officer's findings with respect to the SETT process on

several grounds.

First, the District objects to the Hearing Officer's finding that the SETT framework was

never concluded during the 2018–2019 school year.  Dist. Br. at 12.  This objection fails because

the District does not supply any evidence on which the Court could reject the Hearing Officer's

conclusion.

Before proceeding into the facts, it is useful to restate the standard of review.  "Factual

findings from the administrative proceedings are to be considered prima facie correct," and this

Court must explain any rejection of them.  Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 199

(quoting State-Operated Sch. Dist. of City of Newark, 336 F.3d at 270).  And "district court judges

are not required to ferret out delectable facts buried in a massive record."  Chavez v. Sec. Fla.

Dep't of Corrections, 647 F.3d 1057, 1061 (11th Cir. 2011).  Here, the administrative record is

easily over one thousand pages.[4]  The District cannot expect this Court to reject any of the Hearing

Officer's findings unless it identifies specific, persuasive record evidence to ground that rejection.

It has failed to do so.

To begin with, the May 10, 2019 IEP provides compelling evidence the SETT process was

not completed.  That IEP states, "SETT process to occur until team agrees it is completed."  S-33

at 63.  If the SETT framework were already complete, that sentence would be unnecessary.  Any

---

[4] Because the only copy of the administrative record in this case was filed in hard copy, this Court does not have a precise page count.

evidence the District provides must convincingly rebut that sentence's implication that the SETT framework was incomplete.

The District first points to the testimony of Trish Byron.  Although the memorandum and Statement of Material Facts accompanying the District's brief use that testimony to show that the SETT framework was completed, ECF 13-1 ¶ 54, Dist. Br. at 13, the District's reply brief ultimately refines the District's position.  That brief clarifies that, as the District sees it, the testimony shows that "Ms. Byron's involvement was concluded . . . ."  Dist. Reply Br. at 9.  That is true enough.  But the conclusion of Ms. Byron's involvement hardly means that the SETT framework was concluded.  Indeed, her testimony was directly to the contrary.  She testified that after providing preliminary assessments and advice to begin the SETT framework, she "would not typically receive any feedback from the[ District] unless they had questions or concerns."  N.T. 450.  And even though the District contends Ms. Byron testified that "[d]ata in regard to the trialing of assistive technology tools was shared during a phone call,"  Dist. Reply Br. at 9; N.T. at 450, nothing in her testimony indicates that the data collection had been *completed* when shared.  In fact, she testified that she was unaware whether a completed SETT framework had been shared with the family.  N.T. 450.  Ms. Byron's testimony does not contradict — or, therefore, rebut — the Hearing Officer's finding that the District had not finished administering the SETT framework.

The District next points to preliminary SETT framework documents, Exhibits S-32 and P-38.  Exhibit P-38 appears to be dated October 23, 2018, and Exhibit S-32 appears to be dated January 17, 2019.  Both describe plans for evaluating G.W.  Neither reflects that those plans were carried out.  Exhibits P-38 and S-32 provide compelling evidence that the District began administering the SETT framework.  But, as far as this Court can tell, they supply no evidence that the District finished doing so.

The District finally points to the May 10, 2019 IEP as evidence that SETT framework "data collection was almost if not already concluded." The District's apparent concession that "data collection was almost . . . concluded" as of the May 10, 2019 IEP speaks for itself.

Ultimately, the District has supplied no evidence that would allow this Court to reject the Hearing Officer's finding. This Court will sustain the Hearing Officer's finding.[5]

Second, the District objects to the Hearing Officer's conclusion that the SETT framework is an "evaluation," and contends that the Hearing Officer should have considered the SETT framework as part of G.W.'s educational programming. Dist. Br. at 12–13. The difference matters. As the parties agree, evaluations generally must continue when parents file a due process complaint, but new educational programming generally must be paused to protect the student from changes that will undermine the student's educational progress. The District, apparently treating the SETT framework as new educational programming, paused implementation of the SETT framework when the Parents filed the due process complaint. The District only resumed it after receiving the Parents' consent in January 2019. Practically speaking, the SETT framework has features of both an evaluation and educational programming. Here, the parties agreed to implement the SETT framework to fulfill the Private Evaluator's recommendation of "an assistive technology assessment." An "assessment" is a kind of "evaluation," and vice versa. And the parties memorialized their agreement in the July 11, 2018 revision of the IEP as a "SETT Evaluation."[6] As that memorialization predates the present litigation, it provides relatively reliable

_____

[5] To the extent that the District attacks the Hearing Officer's finding that the Parents have not been informed of the result of the SETT framework, if any, that objection is groundless. Given the Hearing Officer's reasonable conclusion that the SETT framework was still being administered, his conclusion that the Parents have not been informed of the ultimate results of the SETT framework is also reasonable.

[6] Exhibits S-32 and P-38, each of which is a preliminary SETT framework document, also describe "Evaluation" strategies.

evidence of how the District understood the SETT framework.  Given the context and memorialization of the District's agreement to conduct the SETT evaluation, the Hearing Officer's conclusion that the SETT framework was legally an evaluation was reasonable.

Third, the District objects to the Hearing Officer's findings of when the Parents gave the Private Evaluation to the District — whether it was in March or June of 2018.  Dist. Br. at 15.  This Court does not see how the Hearing Officer's conclusion rested on these findings.  Again, the Hearing Officer's conclusion that the District denied G.W. a FAPE rested on the Hearing Officer's conclusions about the District's failure to complete evaluation obligations that agreed to abide by in July 2018.  Ruling at 16.  What led the District to take on those obligations and when are not pertinent.  Even if the Hearing Officer's findings were in error — a question which the Court will not reach — those errors would not provide grounds for this Court to reverse the Ruling.

Fourth, the District contends that there is no evidence that G.W. was actually denied a FAPE by the District's failure to complete the SETT framework.  Dist. Br. at 21.  This argument fails for the same reasons as the District's parallel argument with respect to the PAES evaluation.  The District failed to conduct requisite evaluations of G.W., which, in and of itself, constituted a substantive denial of his FAPE in the areas for which the District failed to evaluate.

Overall, the Hearing Officer's Ruling was appropriate.  The District agreed to conduct certain important evaluations that would inform G.W.'s educational programming in the 2018–2019 school year.  It either failed to complete those evaluations or completed them so late that they could not inform G.W.'s educational programming in the 2018–2019 school year.  The District's failings with respect to the PAES, which was more crucial, seems to have been more severe.  Nonetheless, the District did not entirely deny G.W. an appropriate education, and the Hearing Officer recognized that fact by awarding G.W. only half an hour of compensatory education per

hour spent with the District.  The Hearing Officer's ruling with respect to the 2018–2019 school year was reasonably supported by the record.  This Court will therefore AFFIRM that portion of the Ruling.

       iii.    <u>Compensatory Education</u>

The District objects generally to the Hearing Officer's award of compensatory education.  Mostly, it restates its conviction that it provided G.W. a FAPE and that G.W. made progress in relation to his potential.  Dist. Br. at 21–26.  The District has the burden of persuasion on this issue.  <u>See</u> <u>Ridley Sch. Dist.</u>, 680 F.3d at 270.  As the District has not supplied sufficient evidence to disturb the Hearing Officer's finding that the District denied G.W. a FAPE, the Court sees no factual reason to disturb the Hearing Officer's award of compensatory education.

Nor is there any evidence that the award of compensatory education was legally "punitive," as the District contends.  Instead, the Hearing Officer recognized that the District's evaluative failings in the 2018–2019 school year slowed G.W.'s progress but did not result in a total denial of FAPE and reduced the award of compensatory education accordingly.

      b.    <u>Additional Remedies: Fees and Costs</u>

The Court may award fees, including expert's fees, and costs to plaintiffs who "prevail" on IDEA claims; the award is in the Court's discretion.  20 U.S.C. § 1415(i)(3)(B).  "When a prevailing party is only partially successful the court can, in its discretion, reduce the award to reflect the partial success."  <u>Norristown Area. Sch. Dist. v. F.C.</u>, 636 F. App'x 857, 864 (3d Cir. 2016) (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 436–37 (1983)); <u>accord</u> <u>Joan P.B. v. Khepera Charter Sch.</u>, 420 F. Supp. 3d 347, 353 (E.D. Pa. 2019) (district court has discretion to "adjust the lodestar downward" to reflect "partially unsuccessful claims").  But that reduction need not be strictly proportional to the number of claims that succeeded; where "a party's claims 'involve a

common core of facts or [are] based on related legal theories,'" the court has discretion supplement the partial award.  F.C., 636 F. App'x at 864.

By winning an award of compensatory education below, the Family prevailed in part in the administrative proceeding below.  And by successfully defending that award in this appeal, the Family has prevailed entirely in this Court.  The Family has asked that this Court award it fees and costs.

First, given that the Family challenged the District's conduct over about three years, and it won roughly one school year's compensatory education, the Family is entitled to an award of 50% of its reasonable fees and costs incurred in the administrative proceeding below.  The Family prevailed on around one-third of its claims.  One-half is, of course, greater than one-third.  But this Court is mindful that the amount of legal work involved in challenging the District's conduct does not scale directly with the number of years the Family decided to put at issue.  Some fees would not have changed whether the Family attacked the District's conduct over three years or three months.  Given that, it is appropriate to grant the Family a percentage of its costs and fees that is greater than the percentage of school time for which the Family won relief.[7]

Second, given that this Court is affirming the entirety of the Ruling, the Family is entitled to an award of all of its reasonable fees and costs incurred in the proceedings in this Court.

---

[7] This is consistent with this court and other courts' decisions in granting fee awards in IDEA-based challenges.  See, e.g., T.B. v. San Diego Unified Sch. Dist., 293 F. Supp. 3d 1177, 1204–05 (S.D. Cal. 2018) (awarding fifty percent of fees where claims were interrelated but some were denied); Joaquin v. Friendship Pub. Charter Sch., 188 F. Supp. 3d 1, 11–12 (D.D.C. 2016) (same); cf. Reid ex rel. Reid v. Sch. Dist. of Phila., Civ. Act. No. 03-1742, 2005 WL 174847, at *3 (E.D. Pa. Jan. 21, 2005) (Shapiro, J.) (reducing fee award by fifty percent where parties "re-litigat[ed] settled issues" on IDEA claim).

**VI.** <u>**Conclusion**</u>

For the foregoing reasons:

- The Hearing Officer's Decision is AFFIRMED.

- The Family's Motion for Judgment on the Administrative Record is GRANTED, and the District's DENIED.

- The Family is AWARDED 50% of its reasonable fees and costs incurred in the due process hearing below, and 100% of its reasonable fees and costs incurred here.

An appropriate Order will issue.

O:\CIVIL 19\19-5424 Downington Sch Dist v GW\Memorandum Opinion re Motions for Judgment on the Administrative Record.docx

24